UNITED STATES of America

v.

A JUVENILE.

No. CR77–30056–01.

United States District Court,
D. South Dakota.

June 29, 1978.

David V. Vrooman, U. S. Atty., Sioux Falls, S. D.

David L. Bergren, Fort Pierre, S. D.

MEMORANDUM OPINION

BOGUE, District Judge.

On June 1, 1977, the United States filed an information charging defendant a juvenile with two violations of 18 U.S.C. § 1153, the Major Crimes Act. Defendant is a ju-

venile and an enrolled member of the Cheyenne River Sioux Tribe. The United States has charged that defendant committed a burglary and a larceny in the City of Eagle Butte, South Dakota.

Defendant, through his court-appointed attorney, moved this Court to dismiss the information for lack of federal jurisdiction upon the theory that the land upon which the offenses are alleged to have been committed is not "Indian country" as defined by 18 U.S.C. § 1151. Defendant and his counsel thereafter entered into a stipulation of fact with the United States (docket entry 24).

The crucial facts underlying the jurisdictional question are these:

(1) The business establishment in which the crimes of burglary and larceny are alleged to have been committed is located on fee patented land.

(2) This fee patented land lies within the geographical boundaries of the Cheyenne Indian Reservation as established by an Act of Congress on March 2, 1889, 25 Stat. 888.

(3) The land where the crimes are alleged to have been committed also lies within the geographical area which was opened to settlement by an Act of Congress on May 29, 1908, 35 Stat. 460, and a Presidential Proclamation of August 19, 1909, 36 Stat. 2500.

Thus, the question presented is whether or not the Act of May 29, 1908, disestablished that portion of the original Cheyenne River Indian Reservation within which defendant is alleged to have committed criminal acts.

## I. PRELIMINARY STATEMENT

This Court was initially somewhat reluctant to even consider this jurisdictional question in that it appeared at first blush to be a matter that had been decided previously by the Eighth Circuit Court of Appeals. *United States ex rel. Condon v. Erickson,* 478 F.2d 684 (8th Cir. 1973). Defendant and his counsel urged, however, that the guidelines set out by the Supreme Court in *DeCoteau v. District County Court,* 420 U.S. 425, 95 S.Ct. 1082, 43 L.Ed.2d 300 (1975),

and *Rosebud Sioux Tribe v. Kneip, et al.,* 430 U.S. 584, 97 S.Ct. 1361, 51 L.Ed.2d 660 (1977) required a reexamination of the question presented in *Erickson, supra.* Moreover, the Supreme Court of South Dakota, in the proper exercise of its jurisdictional authority, had held in June of 1977 that the Cheyenne River Indian Reservation was diminished by the Act of 1908; in effect, that Court had reached the result urged by defendant in this case. *Stankey v. Waddell,* 256 N.W.2d 117 (S.D.1977). This Court, therefore, scheduled a hearing and prepared to consider this jurisdiction question.

Before the hearing was held the Eighth Circuit Court of Appeals decided the jurisdictional question presented in *United States v. Long Elk,* 565 F.2d 1032 (8th Cir. 1977). In a footnote reference to *Stankey v. Waddell,* the Eighth Circuit noted that the South Dakota Supreme Court had "questioned the continued validity" of the *Erickson* decision, but the federal appellate court went on to state:

> In *Erickson,* we could find no clear expression of an intent by Congress to diminish the size of the Reservation. Both the language of the Act and its legislative history appeared to us to be equivocal. We find no reason now to question our decision in *Erickson.* 565 F.2d at 1036, n. 10.

The Court further stated that the results in *Rosebud, DeCoteau* and *Erickson* were harmonious.

At this juncture it appeared on the one hand that the holding of *Erickson,* challenged by defendant, had been explicitly upheld; hence, this Court's inquiry would be unnecessary. On the other hand, the Eighth Circuit's statement: "We find no reason now to question our decision in *Erickson*" seemed to imply that if there were a good reason, then *Erickson* would be reconsidered. Thus, this Court again went forward with the inquiry relative to the jurisdictional question.

■ The legal principles which have guided our inquiry were set out succinctly

in the Supreme Court's opinion in *Rosebud*, 97 S.Ct. at 1363. Because our reasoning must be strictly guided by those principles, we will enumerate them here. In determining whether or not the boundaries of the Cheyenne River Indian Reservation were diminished by the congressional enactment of 1908, we must consider the following:

(1) Congressional intent is controlling.

(2) Doubtful or ambiguous expressions are to be resolved in favor of the Indians.

(3) Opening a reservation for settlement does not necessarily mean that the opened area loses its reservation status.

(4) The canon of construction requiring that doubtful expressions are to be construed in favor of the Indians, does not require a determination that reservation status survives congressionally manifested intent to the contrary.

(5) In order to ascertain congressional intent, a court is obliged to look at the Act in question, the surrounding circumstances and the legislative history.

Additionally, it is clear that an inquiry of this nature "may encompass all materials reasonably pertinent to the legislation. . . ." *Rosebud Sioux Tribe v. Kneip, et al.,* 521 F.2d 87 (8th Cir. 1975) relying on *DeCoteau, supra.*

■ Ordinarily, an inquiry to find the meaning of an act begins with an examination of the text of the act in question. Consideration of legislative history and the circumstances surrounding the passage of the act is necessary only if an examination of the text of the act itself leads to the conclusion that its terms are unclear or that its meaning is ambiguous.

■ The situation in which this Court finds itself is, however, extraordinary in the following respects. In 1911 the question now presented was raised before a United States District Judge for the District of South Dakota in *United States v. LaPlant,* 200 F. 92 (1911). Judge Willard, it appears, thought the act was plain on its face, and without resort to legislative history he concluded that the act opening the Cheyenne River Reservation had diminished it in a geographical sense. In 1972, pursuant to an order from the Court of Appeals for the Eighth Circuit, Judge Nichol, Chief Judge for the District of South Dakota, held an evidentiary hearing to consider the question that had been presented in *LaPlant.* Judge Nichol concluded that Congress had not by express language changed the 1889 boundaries of the Cheyenne River Reservation although it appeared that the 1908 Act had reduced the boundaries by implication. *United States ex rel. Condon v. Erickson,* 344 F.Supp. 777 (D.C.1972). On appeal Judge Stephenson, writing for the Eighth Circuit, stated:

> We cannot say that the 1908 Act on its face affected the exterior boundaries of the reservation, although it is admittedly a close question. *Erickson,* 478 F.2d at 687.

Judge Stephenson then went on to state that the meaning of the 1908 Act with respect to reservation boundaries was "not clearly discernible by application of the traditional methods of statutory construction." 478 F.2d at 688. In 1977 the Supreme Court of South Dakota, in light of the United States Supreme Court's opinions in *DeCoteau* and *Rosebud,* and after detailed examination of the legislative history, concluded that Congress had clearly manifested an intent to alter the boundaries of the Cheyenne River Reservation by the 1908 Act.

It is clear to this Court that the ultimate resolution of the question presented in this case will not be reached without a careful examination of the historical context in which the 1908 Act was passed. Therefore, we have undertaken to set out what we believe are important aspects of that historical context in a chronological order, and the Act itself will be examined in light of events and statements that preceded it.

Reference will be repeatedly made to a document attached to the memorandum filed by the United States which attach-

ment is entitled: "Jurisdiction on the Cheyenne River Indian Reservation: An Analysis of the Causes and Consequences of the Act of May 29, 1908." This document was prepared by Dr. Frederick E. Hoxie, an historian retained by the government. While this Court does not agree with many of the conclusions drawn in that analysis, it appears to constitute the foundation of the government's case; hence, we will try to deal with all of the major arguments contained therein.

## II. THE HISTORICAL SETTING

The events of American history that preceded the enactment of so-called "surplus land statutes" that were to affect the lands formerly dominated by the Sioux Nation are well known to everyone involved in this case; hence, the sketch here can be very brief. The boundaries of the Great Sioux Reservation were established by treaty in 1868. By acts of Congress this reservation was split up into several smaller reservations. One of these was the Cheyenne River Reservation which was created in 1889. The land not encompassed by these smaller reservations became part of the public domain.

In 1889 congressional policy toward Indian tribes was undergoing significant change. Approximately ten years earlier a national policy of assimilation had been initiated.[1] The General Allotment Act or Dawes Act of 1887[2] was a result of this change in national policy. The change in policy was likewise reflected in section 12 of 25 Stat. 888 (1889) by which the Cheyenne River Reservation was established. Section 12 provided a means by which the Indians could sell and the United States could buy portions of the remaining reservations for the purpose of making land available for settlers.

In an attempt to carry out this policy of assimilation, the federal government adopted a three-part program.[3] The first part of the program was a national system for the education of Indian children. The second component was a land allotment system designed to teach Indian people to be self-sufficient farmers. The third component was the extension of United States citizenship to individual Indians who accepted an allotment of land.

As was noted by the Eighth Circuit Court of Appeals in *Erickson*, this assimilation policy and the specific programs designed to effect it were the product of an alliance between "easterners sympathetic to the Indians and western politicians."[4] The easterners or reformers, whom Hoxie calls the "principal architects of the assimilation program,"[5] labored in the belief that the possession of private property (160 acre plots of ground) would be a great benefit to the Indians because it would tend to "raise" them to a higher stage of culture. The westerners may not have been very much concerned with theories of social evolution, but did agree with the desirability of the allotment idea inasmuch as it inevitably led to the availability of "surplus" lands.

The "surplus lands" concept derived from the relationship of numbers of people to acres of land. The reservations were relatively large and the Indians were relatively few. The prevailing assumption was that 160 acres was the "right" amount of land for one person (Indian or non-Indian) and that more than that could not be "used properly." Thus when each Indian person was allotted 160 acres, some reservation land was necessarily "surplus."

To the reformers it seemed logical that white farmers should take these tracts and farm them, so that they might share their knowledge of sound agricultural practices and provide good examples for Indian farmers. To western politicians the surplus land

---

1. Jurisdiction on the Cheyenne River Indian Reservation: An Analysis of the Causes and Consequences of the Act of May 29, 1908, (hereinafter "Hoxie") pp. 1–5.

2. 24 Stat. 388.

3. Hoxie, pp. 5–9.

4. 478 F.2d at 686.

5. Hoxie, p. 5.

idea made sense because it gave their constituents new opportunities for prosperity. Thus, the "familiar forces" referred to by the Supreme Court in *DeCoteau*[6] were constantly bringing pressure to bear on congressional delegations to open Indian lands for settlement.

The period during which the policy of assimilation guided federal programs for Indians can be divided into two segments, according to Dr. Hoxie's analysis.[7] The first segment extended from 1880 to approximately 1895; the second from 1895 to approximately 1920. While assimilation remained the goal, and land allotments remained one of the specific programs intended to achieve that goal throughout the period from 1880 to 1920, it is urged by government counsel that ". . . the 'assimilation' process had nuances and subtleties to it that make it clear it was not implemented by Congress or the personnel within the Bureau of Indian Affairs throughout this time period with the same methods or the same expeditious intent."[8] In short, the intentions and methods of policy-makers changed over the years.

Government counsel goes on to assert that a comparison of the two segments of history referred to will reveal, along with the continuity of purpose, a contrast that is critical; specifically: ". . . a contrast with an important *legal* significance that was previously not apparent because of the generally incorrect assumption that the congressional intent in passing the Dawes Act of 1887 to encourage *expeditious* assimilation continued to be the intent of Congress and the Interior Department throughout the remaining history of the assimilation process."[9] The argument, it appears, is that prior judicial decisions in this area have simply been erroneous because the courts have failed to grasp the subtleties and nuances of history now apparent to experts upon more careful examination.

It is alleged that segment II of the campaign for assimilation, as opposed to segment I, was more dominated by westerners who were less reform-minded than the earlier architects of the policy; that segment II was dominated by people who had lost the belief in inevitable human progress and who tended to be pessimistic and cautious; and that these changes in attitudes resulted in a modification of programs. Educational programs were re-oriented toward teaching of vocational skills rather than "civilization." Restrictions on the leasing of Indian allotments were eased. The campaign to extend citizenship was deferred. And, policy-makers during the second segment of the campaign did not envision rapid dissolution of tribal loyalties and tribal organizations, nor did they expect rapid and complete integration of Indians and non-Indians.

Because the campaign for assimilation had not been as "successful" as had been initially expected, it is urged, policy-makers began to operate with the expectation that federal responsibility for law and order, social and educational services, and economic development would continue indefinitely into the future. It is argued, therefore, that federal officials (legislators and administrators) who were policy-makers at the turn of the century, expected that thereafter the federal government, not state governments, would take the responsibility to serve the needs of Indian people, and intended there would be continuing federal jurisdiction over Indian people. In view of the conclusion that the events on the Cheyenne River Reservation surrounding the passage of the 1908 Act are a "microcosm of the early twentieth century period,"[10] it follows, according to the argument, that Congress could not have intended to and did not intend to reduce the exterior boundaries of the Cheyenne River Indian Reservation.

This argument made by government counsel is relatively creative, and Dr. Hox-

---

6. 95 S.Ct. 1086.

7. Hoxie, pp. 2–20.

8. Memorandum of the United States (hereinafter M.U.S.) at 8.

9. M.U.S. at 10.

10. Hoxie, p. 19.

ie's analysis is somewhat novel, but we cannot accept their conclusions for they simply are not the state of the law.

The government's argument is rejected for the following reasons. First, the areas within which the federal government has dispensed and now dispenses economic and educational benefits to Indians have not been and are not now necessarily co-extensive with the areas within the confines of Indian reservations. *See e. g. Morton v. Ruiz,* 415 U.S. 199, 94 S.Ct. 1055, 39 L.Ed.2d 270 (1974). Second, responsibility for law and order has not been and is not now limited to reservations, but includes dependent Indian communities and all Indian allotments, the Indian titles to which have not been extinguished. *See United States v. Pelican,* 232 U.S. 442, 34 S.Ct. 396, 58 L.Ed. 676 (1913) and 18 U.S.C. § 1151(b) and (c). Third, a policy of maintaining tribal organization and a policy of maintaining tribal customs and cultural identity can coexist with a policy of reducing reservation size or even abolishing reservation status. As the Supreme Court recognized in *DeCoteau* with respect to the Sisseton-Wahpeton bands: [11]

> . . . the tribe and the Government were satisfied that retention of allotments would provide an adequate fulcrum for tribal affairs.

Fourth, the argument asks this Court to assume that the Supreme Court's analysis in *Rosebud* was shallow, and possibly "erroneous." Fifth, the government would require this Court to deduce the meaning of one particular statute from a general proposition derived from a study of late nineteenth and early twentieth century history even if the result stands in sharp opposition to the legislative history of the statute itself.

If the four decisions of the Supreme Court, to-wit: (1) *Seymore v. Superintendent,*[12] (2) *Mattz v. Arnett,*[13] (3) *DeCoteau* and (4) *Rosebud* have taught us nothing

else at all, these decisions ought to leave no doubt in our minds that the question of whether or not an act of Congress was intended to disestablish an Indian reservation in whole or in part cannot be answered by resort to generalities alone. Indeed, "surrounding circumstances" and "background" have increasingly been recognized as important. But, records of surrounding circumstances have been used in conjunction with studies of legislative history in order to find the indicia of congressional intent in each particular instance. In no case of this type available to us has any court gathered data about an era of history, adopted a general statement about the policy of the era, and *then without relying upon the records of events immediately surrounding the passage of an act,* attempted to discern the meaning of the legislation. This is the broad-brush approach at its extreme.

We can and must compare similar statutes passed under similar circumstances, but ultimately: "Each case, of course, must be decided under the applicable statute and upon its own facts." [14] This Court has the task of digging through the records of events preceding the 1908 Act, examining the legislative history of the Act and the Act itself, and finally considering the jurisdictional history of the area. Then, and only then, can we determine whether the Act fits into a pattern or conforms to general statements about historical data.

## III. THE GAMBLE PROPOSAL AND INSPECTOR McLAUGHLIN'S CONFERENCES WITH THE INDIANS

From the records made available to this Court, it appears that the first official request to open the Cheyenne River Reservation to settlers came from Thomas Downs, an Indian agent who had served on the Cheyenne River Reservation. On November 23, 1907, he wrote to the Commissioner

---

**11.** 95 S.Ct. at 1094.

**12.** 368 U.S. 351, 82 S.Ct. 424, 7 L.Ed.2d 346 (1962).

**13.** 412 U.S. 481, 93 S.Ct. 2245, 37 L.Ed.2d 92 (1973).

**14.** *Erickson,* 478 F.2d at 689.

of Indian Affairs about the question of re-leasing Indian lands to the Hansford Land and Cattle Company and stated:[15]

> From my experience while in charge of this Agency, and more especially from the happenings within the past thirty days, I am about convinced that, for the good of the Indians and the country round about, this reservation should be thrown open to settlement as soon as possible. Letter from Special U.S.I. Agent Thomas Downs to the Commissioner of Indian Affairs, November 23, 1907.

The rest of the letter makes it plain that Downs was looking at the whole matter from the standpoint of an official who was charged with carrying out the programs designed to accomplish the goal of assimilation. He thought that his job would have been much easier if white farmers had been settled in the midst of the Indians.

The reply from the Office of Indian Affairs to the Downs letter instructed the Superintendent in charge of the Cheyenne River Agency to convene a meeting of the tribal business council at his earliest convenience in order to consider the question of re-leasing pasture land. The idea of pushing for an opening of reservation lands for settlement was rejected with the following statement:[16]

> It has not been the policy of the office, as a rule, to take the initiative in opening Indian lands to public settlement. Until there is some demand by the local community or the country at large it is regarded as the better policy *to let the lands remain in a state of reservation.* Letter of G. F. Larrabee, Acting Commissioner of Indian Affairs to the Superintendent of the Cheyenne River Agency, December 11, 1907. (Emphasis added.)

Two things of interest can be learned from these letters. First, the Office of Indian Affairs was not pressing for an opening of the reservation. This seems to harmonize with Dr. Hoxie's view of official policy during this period of time. Second, the Acting Commissioner considered an opening to public settlement to be the opposite of letting "the lands remain in a state of reservation." If throwing the lands open to settlement had *not* been equated in his mind with taking the land out of a reservation status, then the remark quoted, *supra,* would make no sense.

Obviously, these records of thoughts of an acting commissioner in December of 1907 do not demonstrate conclusively the intent of Congress several months later. They do, however, illustrate the understanding of one official dealing with the Cheyenne River Indian Reservation. It was his belief that if the Congress threw open the Cheyenne River Reservation for settlement, then the land thrown open would no longer remain in a state of reservation.

The pressure for opening the Cheyenne River Reservation came from local interests. Exactly when and in what manner these local interests first made their demands for an opening, we do not know. We do know that Senator Robert J. Gamble took their cause to Washington and on December 9, 1907, introduced S. 1385, a bill to authorize the sale and disposition of certain surplus lands on the Cheyenne River Reservation and Standing Rock Reservation in the State of South Dakota.[17] If S. 1385 had been enacted as proposed by Senator Gamble, it would have only opened what was then Schnasse County, or about 350,000 acres in the northwest corner of the Cheyenne River Reservation and the southwest corner of the Standing Rock Reservation.[18] This bill went for consideration to the Senate Committee on Indian Affairs.[19]

On December 20, 1907, Moses E. Clapp, Chairman of the Senate Committee on Indian Affairs, sent a copy of S. 1385 to Frank Pierce, Acting Secretary of the Interior, for

---

15. Source: Bureau of Indian Affairs, Letters Received, # 93751, 1907, Records Group 75, Nation Archives; *see* Hoxie, appendix 7.

16. *id.*

17. 42 Cong.Rec. 207 (1907).

18. *See*, Hoxie, p. 61 (Figure 3).

19. 42 Cong.Rec. 207 (1907).

comment. Mr. Pierce decided to refrain from making any comment until he had heard the views of the Indians themselves. On December 26, 1907, the Commissioner of Indian Affairs, at the direction of Mr. Pierce, sent a letter to an experienced Indian Inspector, James McLaughlin, and directed him to proceed to the Cheyenne River and Standing Rock Reservations to lay before the Indians the terms of the enclosed bill (S. 1385) and to solicit their views.[20]

In giving instructions to McLaughlin, Commissioner Leupp called attention to the possibility, suggested by Senator Gamble, that more than just Schnasse County could be included in the negotiations. The instructions to McLaughlin ended with the statement: [21]

> The instructions given you before you conferred with the Rosebud Indians concerning the opening of Tripp County may be followed so far as applicable. Letter from F. E. Leupp, Commissioner of Indian Affairs to James McLaughlin, U.S. Indian Inspector, December 26, 1907.

It was McLaughlin who conferred with the Rosebud Sioux prior to a 1907 Act and thereby reached an agreement with a majority of the adult males that they would cede their claim to lands in that part of the Rosebud Reservation which included Tripp County. Congress chose to disregard the fact that three-fourths of the adult males did not agree to the cession, and by use of its plenary power enacted a House Bill which did not incorporate the agreement but did open to settlement the land that had been the subject of negotiations. The instructions under which McLaughlin operated at Rosebud, when he entered into negotiations concerning the land in Tripp County, were instructions to conduct nego-

tiations for a *cession of land*.[22] At the direction of his superiors he went to the Cheyenne River Reservation with the same instructions in mind.

On December 26, 1907, Acting Secretary Pierce also wrote to Senator Clapp.[23] He asked that Congress defer action on the Gamble bill until McLaughlin could ascertain the desires of the Indians. Mr. Pierce went on to explain the reasoning behind his request in this manner:

> I am induced to follow the course in part by the fact that I have been advised that these Indians may desire to *cede* a greater area than the bill covers. . . . Letter from Frank Pierce, Acting Secretary of the Interior to Senator Moses E. Clapp, Chairman of the Senate Committee on Indian Affairs, December 26, 1907. (Emphasis added.)

It is clear that Acting Secretary Pierce thought the Gamble proposal involved a *cession* of the lands therein described.

The Indians on the Cheyenne River Reservation soon got word of the Gamble bill. A General Council Meeting was held on the 6th, 7th and 8th of January, 1908. Senator Gamble's bill was read to the council. The General Council did not like it and requested their Business Council to write a letter to the Indian Rights Association to ask that organization to use its influence to stay congressional action.[24]

Mr. McLaughlin went first to Fort Yates, North Dakota, to confer with the Indians of the Standing Rock Reservation. The conference began on March 9, 1908, and ended late on March 10, 1908. A transcript of the discourse of Inspector McLaughlin, and the statements of the Indians in response to his

---

20. *See* Defendant's Ex. A, Doc. 2. Defendant's counsel and government counsel stipulated to the authenticity of this document, and many others, at the evidentiary hearing on January 9, 1978. This Court was not provided with the source of this document.

21. *id.*

22. *See* the Supreme Court's Opinion in *Rosebud*, 97 S.Ct. at 1373.

23. S.Rep.No.439, 60th Cong. 1st Sess. (1908) at 5. This letter was made a part of S.Rep.No. 439; therefore, citation is made to that report.

24. Proceedings of General Council of the Cheyenne River Sioux Tribe, January 6, 7 and 8, 1908 at White Horse, South Dakota. Source: General Correspondence, Cheyenne River, file 054, Records Group 75, National Archives; Hoxie, appendix 32.

questions and suggestions is available to us.[25]

Chief Justice Dunn of the South Dakota Supreme Court made many references to this conference and also quoted extensively from the transcript in his opinion in *Stankey v. Waddell, supra.* The attorneys for the United States have taken issue with Chief Justice Dunn's use of this material, and have stated that they think he used it erroneously either through "lack of precision" or "inadvertence" in his opinion pertaining to the Cheyenne River Indian Reservation.[26] In the view of the attorneys for the United States, this use of historical materials by Chief Justice Dunn is ". . . the inevitable consequence of casually 'lumping' together materials affecting diverse tribes and reservations; a practice followed by those seeking to cloud the issue."[27] Such a view by said United States attorneys is unfortunate and uninformed.

This Court agrees with the approach taken by Chief Justice Dunn. Certainly, when a reservation diminishment question is presented, the specific act that is alleged to have brought about the diminishment must be examined with care; that act and no other is controlling; and no broad-brush approach is to be used. But, in this situation, Chief Justice Dunn's use of the historical material is hardly a broad-brush approach or an irresponsible commingling of records referring to "diverse tribes and reservations."

Nobody disputes the fact that before 1908 the Standing Rock Reservation and the Cheyenne River Reservation adjoined one another. The same Act that opened the Standing Rock Reservation for settlement in 1908 also opened the Cheyenne River Reservation. That single Act was preceded by House and Senate Committee reports[28]

that included a letter from Inspector McLaughlin pertaining to both reservations and the transcripts from the conferences with the Indians *at both reservations.*

No reasonable person could conclude under these circumstances that Congress manifested one particular intent when dealing with the Standing Rock Reservation and a contrary intent when dealing with the Cheyenne River Reservation in this one Act. Therefore, the records of the conference which Inspector McLaughlin had with the Indians at Fort Yates are important to an understanding of the intent of Congress with reference to the Cheyenne River Reservation.

Restating everything set out by Chief Justice Dunn in *Stankey v. Waddell* would be of no benefit. Several points, however, merit renewed consideration.

Both Inspector McLaughlin and the Indians assembled at Fort Yates were well aware of the *Lone Wolf*[29] decision. In fact, the Inspector began the discussion with an exposition of the meaning of that case. The Indians understood that no agreement binding on Congress would be reached, and were aware of the hard political realities of the time. Inspector McLaughlin read and explained not only the provisions of the Gamble bill (which pertained only to Schnasse County), but he also explained the provisions of a bill that had been introduced by Congressman Marshall of North Dakota. The latter would have opened the whole Standing Rock Reservation to settlement. Inspector McLaughlin was convinced that the Congress would pass some bill that would affect more than Schnasse County.

In this context, where Congress was about to enact legislation pressed upon it by "familiar forces," Inspector McLaughlin

---

**25.** The record of this conference was later made part of S.Rep.No.439, *supra*, and also was made a part of H.R.Rep.No.1539, 60th Cong. 1st Sess. (1908).

**26.** M.U.S. at 7, n. 6.

**27.** *id.*

**28.** S.Rep.No.439, part 2, *supra*, and H.R.Rep. No.1539, *supra*.

**29.** *Lone Wolf v. Hitchcock,* 187 U.S. 553, 23 S.Ct. 216, 47 L.Ed. 299 (1903) wherein the Supreme Court held that Congress had the power to abrogate provisions of a treaty between the United States and the Indians.

urged the Indians to agree upon a plan that was somewhere between the Marshall bill and the Gamble bill; his own words at this point are informative:

My friends, as I have before stated, I am not here of my own volition, but sent here by my superiors to present this matter to you and explain it clearly, so that you may understand what is contemplated by these bills which have been introduced in Congress and which are liable to become a law during the present session of that body unless you meet the question with some reasonable proposition that may meet with Departmental approval and be acceptable to Congress.

I know how dear reservations are held by the respective Indian tribes occupying them and how they wish to hold them intact. This is but natural, and were it in my power to have them undisturbed as they now exist I would cheerfully cooperate in having them remain so, did I deem it best for the Indians; but that is impossible, my friends. . . .

Anticipating what is likely to be brought about in this respect, the Secretary of the Interior and Commissioner of Indian Affairs are exceedingly desirous in protecting the Indians and to obtain for them the best terms possible for their surplus lands in the legislation enacted by Congress for their opening.

In the past I favored Indian reservations being held intact, but from observation I have changed my mind as to that and now believe that it will be manifestly better for the Indians to have their surplus lands opened, as it brings in white settlers among them, from whom the Indians may more readily acquire the white man's civilization and industrious habits, and it also provides a better market for the products raised by the Indians.

To meet this question you must prepare for it by consenting to some compromise between these two bills, such as may be accepted as a modification of the more drastic measure contemplated by the Marshall bill, which would open all of the surplus lands of your reservation after allotments were completed.

You have a very large reservation, certainly much greater than you need and much greater than you will be privileged to hold, and I now wish to hear from you regarding the matter which I have so carefully explained. Statement of James McLaughlin, U.S. Indian Inspector, at council meeting held at the Standing Rock Agency, March 9, 1908.[30]

With the words heretofore quoted, Inspector McLaughlin adjourned the meeting until the next morning so that the Indians would have time to discuss the matter among themselves.

The meeting was reconvened the next day, much later than scheduled at the request of the Indians. One of the spokesman for the Indians, Arthur Tibbets, reported:

We have decided here in council to draw a line showing the land we are willing to cede. We have decided to give up 29 townships. That is what was considered and finished last night. Statement of Arthur Tibbets at council meeting at Standing Rock Agency, March 10, 1908.[31]

The Indians were intent on keeping the area likely to be affected by congressional action as small as possible.

In the dialogue that then ensued between Inspector McLaughlin and the Indians, references are constantly made to maps and boundaries. The whole discussion appears to this Court to have been based upon a mutually understood proposition; namely, that the boundaries of the Standing Rock Reservation would be altered by the Gamble bill. A serious study of this case requires an examination of each page of the dialogue which has been preserved in the committee reports. Some statements are particularly enlightening:

McLAUGHLIN: Now, my friends, as to the lines which I have marked on this

---

30. S.Rep.No.439, part 2, *supra*, at 5 and 6; H.R.Rep.No.1539, *supra*, at 9, 10.

31. S.Rep.No.439, part 2, *supra*, at 7; H.R.Rep. No.1539, *supra*, at 11.

map in blue pencil for you to relinquish, if every Indian on this reservation were to receive an allotment within the diminished reservation it would still leave you about 500,000 acres of surplus land, and as there are a great many of your people allotted in the tract that will be ceded, you will therefore have a great many acres of surplus land within your diminished reservation.

The Marshall bill gives you permission to select any lands you may wish in the portion to be ceded, or those who are allotted there may relinquish if they so desire and come within the diminished reservation. This matter is for yourselves to determine, and you will have at least a year and a half or two years before the reservation will be opened. . . . [32]

The reason I am speaking to you with such confidence as to being able to hold the suggested diminished reservation is because I feel that I will have the Secretary and the Commissioner with me in the matter when I submit my report, providing this blue line is adopted. It would be so much better for you to concur in this inner line than to have it taken from you anyway, which I feel quite sure Congress will do and it will be a great satisfaction to you to be a party to the agreement instead of having it taken from you. It is only a matter of two rows of townships more than you propose and it leaves you ample surplus lands for all the stock you will ever possess. . . .

THOMAS FROSTED: . . . There is great danger in the way we have agreed to relinquish a portion of our reservation, which differs from the way the Congress desires, and now, while we have the opportunity, let us try to meet the two propositions halfway. The decision will be with Congress anyhow, and while we have a chance it would be a good thing for us to consider some way in which we may compromise the two bills.

It would be worth while for us to come to some satisfactory agreement whereby we can save a larger portion of our reservation, and in doing this we must try and consider what is desired by Congress.

. . .

If we were to take one step toward the line proposed by the Congressional committee we would be better satisfied and not sorry for the step we had thus taken. In compromising the two bills that have been laid before us we would feel that we were on a solid basis so as to save a larger portion of our reservation. Statements made at Council Meeting at Standing Rock Agency, March 10, 1908.[33]

These excerpts from the dialogue are not quoted for the purpose of proving that an agreement was reached at Fort Yates. Rather, these excerpts illustrate the commonly understood meaning of the bill that later became law. As such, they are part of the surrounding circumstances which the Court may consider under the law as announced in *Rosebud.*

From Fort Yates, Inspector McLaughlin traveled to the Cheyenne River Agency in South Dakota where a council meeting was convened on March 16, 1908. The Agent in charge had been ordered to have the Indians assembled for the conference. Relatively few were in attendance due to inclement weather and bad roads.

The Inspector again discussed the *Lone Wolf* case and its implications. Thereafter, he read and explained two bills, in this case the Gamble bill and a bill introduced by Congressman Hall of South Dakota.[34]

The Inspector then forthrightly told the Indians essentially what he had told the people at Fort Yates. In his own words:

I would suggest that you consider the provisions of both these bills carefully and in a businesslike manner. Agree

---

**32.** S.Rep.No.439, part 2, *supra,* at 10; H.R.Rep. No.1539, *supra,* at 12.

**33.** S.Rep.No.439, part 2, *supra,* at 10, 12, 13; H.R.Rep.No.1539, *supra,* at 12, 16, 17.

**34.** Congressman Hall's bill was analogous to Congressman Marshall's bill and would have opened all of the Cheyenne River Reservation for settlement.

among yourselves upon some compromise measure between the two bills which may receive the approval of the Department and be acceptable to Congress.

Determine upon how much, and what portion, of your reservation you are willing to relinquish; also as to the manner of payment, which, however, must be in accordance with the general provisions of the said bills. . . .

I was for many years in favor of leaving the boundaries of Indian reservations undisturbed; but results of the system have caused me to change my mind relative to same, and I now believe, even if such were possible, that large reservations for Indians, much of which is not occupied by them, is not for the best interests of the Indian occupants. I now believe that it will be manifestly better for the Indians to have their surplus lands opened to settlement, as it brings in white settlers among them, from whom the Indians may more readily acquire the white man's civilization and industrious habits, and it insures a home market for all products raised by the Indians. Statement made at meeting with the Indians at the Cheyenne River Agency, March 16, 1908.[35]

Inspector McLaughlin then adjourned to let the Indians have time to confer, but not without protest from James Crow Feather, Chairman of the Council. Crow Feather was opposed to hasty action on a topic of such importance; moreover, he was concerned that many Indian people had been unable to get to the conference. Crow Feather wanted to limit the discussion to the question of whether or not a council meeting should be held to consider the tribe's reaction to the pending legislation.

Nevertheless, the meeting was reconvened at 7:30 p.m. the same day. Inspector McLaughlin reminded the assemblage that Congress could do as it pleased without asking; he gave as examples the cases with the Blackfoot and Flathead reservations in Montana. He then pressed hard for an opinion from the group. In so doing, he praised the "wisdom" of the people on the Standing Rock Reservation with these words:

After I explained the matter to the Standing Rock people very fully they saw the wisdom of meeting the wishes of Congress in a very reasonable manner, by which I am quite confident that they will have a diminished reservation created, which will remain so for many years, and it will enable them to have allotments for the children born to them for many years to come. Statement at meeting at Cheyenne River Agency, March 16, 1908.[36]

James Crow Feather again asked for more time. Inspector McLaughlin changed the subject. Provisions of the proposed legislation respecting the method of payment and the amount to be paid by the federal government for school lands were discussed.

At one point a member of the group, Allen Fielder, spoke up and stated:

You have told us today that the members from our State have bills in Congress to open up a part or all of our reservation. We heard this some time ago. A good many of us have had that thought in mind and we have thought over the matter. I am in favor of our opening the reservation and don't think there is any use in our trying to fight it.

I am in favor of opening only part of it; we want to reserve some for the future, a diminished reservation. . . . Statement at meeting at Cheyenne River Agency, March 16, 1908.[37]

Again, and we emphasize this, we did not scrutinize the record of that meeting of March 12, 1910, for evidence of an agreement, and we did not choose certain quotations to prove the existence of any agreement. There was no agreement in this instance. Certain statements were taken

**35.** S.Rep.No.439, part 2, *supra,* at 18, 19; H.R. Rep.No.1539 *supra,* at 22, 23.

**36.** S.Rep.No.439, part 2, *supra,* at 20; H.R.Rep. No.1539, *supra,* at 24.

**37.** S.Rep.No.439, part 2, *supra,* at 22; H.R.Rep. No.1539, *supra,* at 26.

from the record to demonstrate what this Court believes is an inescapable conclusion; namely, that the operating assumption upon which all of Inspector McLaughlin's discussions with the Standing Rock and Cheyenne River people were based was the assumption that the Gamble bill and other pending legislation, if passed, would diminish or reduce the size of the reservations involved and necessarily alter reservation boundaries. Moreover, it was assumed in the official correspondence and the conferences with the Indians that a *cession* of land was under consideration.

To maintain that the Inspector, other Department of Interior officials and the Indians had in mind an eventual sale of scattered pieces of real estate which would *not* affect the reservation boundaries, while keeping the evidence in mind, requires extraordinary mental gymnastics. One must assume that Inspector McLaughlin traveled to Fort Yates and the Cheyenne River Agency under the instructions previously given him in preparation for discussions with the Rosebud Reservation Sioux concerning Tripp County; but that he, and the Indians at the Standing Rock and Cheyenne River Reservations with whom he entered into discussions, operated with a markedly different idea of what the effect of pending legislation would be than was the case at Rosebud. One must assume that the Acting Secretary of Interior and lesser officials in the Department of Interior were either extremely careless or hopelessly confused in using the word "cede" and making reference to land being in a "state of reservation." Finally, one must go on to assume that both McLaughlin and the spokesmen for the Indians used the expressions: "diminish," "reduce," "diminished reservation," "relinquish," "cede" and the like, in conjunction with the use of maps showing the outline of what a proposed "diminished reservation" would look like, without really intending to convey the idea that the pending legislation would change reservation boundaries.

This Court is well satisfied that Inspector McLaughlin in his own mind thought the Gamble bill would change the boundaries of the Cheyenne River Reservation if it became law. This Court is likewise well satisfied that this understanding of Inspector McLaughlin's was shared by other persons in the Interior Department of the time, and that this idea was conveyed to the Indians assembled at Fort Yates and the Cheyenne River Agency in March of 1908. But, the Inspector's thoughts and officials' assumptions are not congressional intent. Thus the significant question is whether or not Congress intended to do what these officials assumed Congress intended to do.

## IV. INSPECTOR McLAUGHLIN'S REPORTS AND THE LEGISLATIVE HISTORY OF S. 1385

On March 12, 1908, Inspector McLaughlin sent the Secretary of the Interior a preliminary report of his conferences with the Indians of the Standing Rock Reservation.[38] On March 30, 1908, Inspector McLaughlin, now in Washington, D.C., submitted a complete report of the conferences with the Indians of the Standing Rock and Cheyenne River Reservations to the Secretary of the Interior.[39] With this report he submitted two attachments; attachment one was a transcript of the conference which he had with the Indians at Fort Yates; attachment two was a transcript of the meeting at the Cheyenne River Agency.

The report to the Secretary of the Interior advanced the idea that the compromise position which McLaughlin had put before the Indians was a plan generally acceptable to the majority of them. Several statements made by the Inspector in the letter tend to reveal his ideas relative to the effect of the legislation which he recommended. He stated with reference to his conference with the Standing Rock Indians:

> After a careful study of the proposed legislation, and being quite familiar with

---

**38.** Defendant's Ex. A, Doc. 3A. Counsel stipulated to the authenticity of the document, but the source was not made known to the court.

**39.** S.Rep.No.439, part 2, *supra,* at 1–4.

the conditions prevailing in the Standing Rock and Cheyenne River reservations, and also knowing that the area of these two reservations was much greater than the Indians can make proper use of, and that the opening of some of the surplus lands is demanded in the development of that section of the country, I deemed it best to submit a definite proposition as to the tract I thought the Indians should relinquish, and therefore suggested that they relinquish all the surplus lands of their reservation lying west of the line dividing ranges 23 and 24 in South Dakota and ranges 84 and 85 in North Dakota, together with one tier of townships lying along the southern boundary of their reservation, after allotments to those entitled thereto have been completed.

In order that the Indians might fully understand the boundaries of the proposed diminished reservation I indicated with a blue pencil on a map of South Dakota the area which I believed would be to the best interests of the Indians to relinquish, which map I transmit herewith (Exhibit No. 3). The area indicated by blue-pencil line on said map was clearly explained to the Standing Rock Indians, as may be seen by reference to pages 4 to 17, inclusive, of the council minutes (Exhibit No. 1). Letter of Inspector McLaughlin to the Secretary of the Interior, March 30, 1908.

With reference to his conference with the Cheyenne River Indians, he stated:

. . . I explained the said Senate and House bills with reference to opening the surplus lands of the Cheyenne River Reservation, as shown by the minutes of the council, transmitted herewith (Exhibit No. 2), and it will be seen from said minutes—pages 17 to 24, inclusive—that the Indians realized it would be advisable for them to consent to the opening of a portion of the surplus lands with the hope of thereby securing a diminished reservation. Letter of Inspector McLaughlin to the Secretary of Interior, March 30, 1908.

Upon a careful reading of the transcripts attached to the letter, a reader might differ with the Inspector as to his assessment of the "general sentiment" of the Indians assembled at the Cheyenne River Agency. It is plain, however, that the Inspector communicated to his superiors after the conferences the same operating assumption which we found to exist in the conferences themselves: namely, that the legislation being considered would alter reservation boundaries.

On March 30, 1908, F. E. Leupp, Commissioner of Indian Affairs, wrote to Senator Gamble.[40] The first paragraph of the letter indicates that it was intended as the comment which was solicited back on December 20, 1907, by Moses E. Clapp, then Chairman of the Committee on Indian Affairs. The letter refers to amendments which had been made to the original Gamble bill "to meet the views of the Indians of these reservations as to the form of legislation which should be enacted and the lands to be opened." [41] It appears that Commissioner Leupp relied upon (or at least acted in harmony with) the conclusions transmitted in McLaughlin's report and recommended to the Senate Committee that a bill midway between the original Gamble proposal and the two house bills which would have opened all of both reservations. The Commissioner also asked the committee to consider further amendments to appropriate more money in order that it might be possible to, among other things, make a payment of $2.50 per acre for the 166,000 acres which would be granted to the states for school purposes. He also asked for the authority to cause the lands involved to be examined by experts of the Geological Survey, and for authority to reserve coal lands, if any, for the benefit of the tribes.

On April 1, 1908, the Senate Committee on Indian Affairs submitted the report to which we have heretofore referred. S.Rep. No.439, 60th Cong., 1st Sess. (1908). The Committee recommended a bill that encompassed more land than the original Gamble

40. S.Rep.No.439, *supra*, at 5.

41. *id.*

proposal. The Commissioner's recommendation as to survey of coal lands was incorporated. The report, in its concluding paragraphs, contained these words:

The bill was prepared after full conference with the Commissioner of Indian Affairs and the Secretary of the Interior. The area covered by the provisions of the original bill was intended only as tentative. Certain other provisions were embodied, but it was expected it would be necessary that modifications would be made and these so as to comply as nearly as might be with the wishes of the Indians on the two reservations. It was the purpose to ask of the Indians consent to a relinquishment of all the surplus and unallotted lands upon both reservations that were not necessary for their use and occupation. . . .

The lands reserved for the use of the Indians upon both reservations as diminished, in the opinion of your committee and of the Department, are ample and more than sufficient for the present and future needs of the Indians of the respective tribes. . . .

It is hoped, should the bill become a law and the lands opened as is proposed, other railways will be extended west of the Missouri River through the lands opened to settlement, which will lead to a rapid development of the northwestern section of the State of South Dakota and greatly benefit the Indians not only upon the lands opened to settlement, but also the holdings of the Indians upon the reduced reservations. S.Rep.439, *supra*, at 3, 4 and 5.

Submitted along with the report and expressly made a part of the report were two letters, the first being the letter of Acting Secretary Pierce to Senator Clapp to which he have referred previously; and the second being Commissioner Leupp's letter to the Senate Committee to which we have also referred.

On April 15, 1908, a supplemental report was submitted by the Senate Committee on Indian Affairs. It consisted of Inspector McLaughlin's letter of March 30, 1908, to the Secretary of the Interior from which we have taken quotations as well as the transcripts of the Inspector's meetings with the Indians from which we have quoted even more extensively.

At this juncture let us consider what has heretofore been established. We have traced the idea of opening the Cheyenne River Reservation from its inception in the autumn of 1907, through the conferences between Inspector McLaughlin and the Indians up to the point where on April 15, 1908 a Supplemental Report comes out of the Senate Committee on Indian Affairs. We have, we believe, discovered that the ideas of diminishment, reduction, and a change of the boundaries of the reservations to be affected were operating assumptions of everyone involved in the discussions. The important point is that *the pertinent correspondence and the records of the pertinent discussions were expressly made a part of the Senate Report that accompanied Gamble's proposal (S. 1385) out of the Senate Committee on Indian Affairs.* Thus, the Senate Committee carried forth into the Senate itself the records that contain the operating assumption upon which correspondence and discussions were based—namely, that passage of the Gamble bill would alter the boundaries of the Cheyenne River Reservation and the Standing Rock Reservation.

As stated earlier, Inspector McLaughlin's thoughts are not to be equated with congressional intent, but here we have McLaughlin's statements expressly incorporated into and made a part of a Senate Committee's report. That committee report, all of it, *is essential* to ascertaining congressional intent. Judges have differed about the value to be assigned to various documents that precede the enactment of a law, but even the more cautious judges have admitted the importance of committee reports.[42] And, in both *Rosebud* and *DeCo-*

---

42. *See*, e. g. *Schwegmann Bros. v. Calvert Corp.*, 341 U.S. 384, 395–396, 71 S.Ct. 745, 95 L.Ed. 1035 (1950).

*teau* the Supreme Court examined committee reports to ascertain the intent of Congress.

On April 15, 1908, S. 1385 came to the floor of the Senate.[43] The amendments recommended by the Senate Committee on Indian Affairs were agreed to, and additionally the Senate accepted an amendment proposed on the floor by Senator Gamble which amendment gave Indians residing on allotments in certain townships the right to use timber from certain lands as long as those lands remained within the public domain. Without debate the bill was passed.[44] Thus, the bill which had been introduced on December 9, 1907 to open Schnasse County went off to the House as an act passed by the Senate to open approximately fifty (50) townships in North and South Dakota.

The House Committee on Indian Affairs speedily considered the Act. On April 20, 1908, the Committee reported favorably on the bill passed by the Senate and recommended that the same be passed by the House with minor amendments.[45] The House Committee on Indian Affairs specifically adopted portions of Senate Report No. 439 as well as part 2 of said report which consisted of McLaughlin's letter of March 30, 1908, to the Secretary of the Interior and the transcripts of McLaughlin's conferences with the Indians. Thus, the records reflecting McLaughlin's understanding of this legislation were not only made available to the House Committee, but were incorporated by that committee into its official report. *It appears that the House Committee on Indian Affairs shared the same operating assumption as McLaughlin and his superiors in the Interior Department*: namely, that *the passage of S. 1385 would leave the Indians of the Cheyenne Reservation with a diminished reservation in the sense that the geographical area within the reservation boundaries would be reduced.*

On May 26, 1908, S. 1385 came to the floor of the House and after the bill was read a debate ensued.[46] The substance of the debate concerned the monetary aspects of the Gamble bill. Some Congressmen favored giving only $1.25 per acre for school lands and others favored giving more. Some Congressmen favored a method of payment for lands bought by settlers that would force settlers to bid the going rate after opening; others favored the idea of having the land appraised. As far as we can see, nothing in this House debate touched explicitly on the question of diminishment or reduction of reservation size.

Yet, the House debate makes sense only in light of an assumption that the lands to be opened would be returned to the public domain by the provisions of the Gamble bill. When the value of the land was being discussed, the following statement was made by Congressman Sherman of New York:

> . . . Now the bill further provides for a transfer to the States of North and South Dakota of sections 16 and 36 in each township. The enabling act of those two States provided that the United States should eventually cede such sections to the states, respectively, for school purposes. We make appropriation herein for payment to the Indians for the land thus taken. That will amount to something like 160,000 acres.[47]

This aspect of the House debate will be discussed at greater length later in conjunction with a consideration of one section of the Act. However, it should be noted that Congressman Sherman's reference to the enabling act in this context must have rested on an assumption that the provisions of the Act which granted sections 16 and 36 of each township to the States constituted an implementation of the grant contained in the enabling act by which North and South Dakota entered the Union.

**43.** 42 Cong.Rec. 4753 (1908).

**44.** 42 Cong.Rec. 4755 (1908).

**45.** H.R.Rep.No.1539, 60th Cong., 1st Sess. (1908).

**46.** 42 Cong.Rec. 7004 (1908).

**47.** *id.* at 7005.

The House sent the bill, as amended, over to the Senate. Minor House amendments were accepted in the Senate without debate.[48] President Roosevelt signed the Act and it became law on May 29, 1908.

It appears that neither the Senate nor the House at any time debated the specific question of which governmental entity would have jurisdiction over the area to be opened by S. 1385. It appears further that the matter was not discussed by any committee or at least no one deemed it necessary to put the matter into a committee report if it was discussed. That is not surprising. If our analysis is correct, it was an assumption shared by all that S. 1385 would diminish the Cheyenne River and Standing Rock Reservations and that lands outside of the diminished reservations, which had not been allotted, would become part of the public domain. When settlers moved in and paid for their quarter sections, title to the land would be transferred in fee to settlers and the power to govern opened areas would lie with the States.

Reaction among the local interests in central South Dakota to the passage of the Gamble bill was unrestrained exuberance.[49] The lands opened to "civilization" were said to contain resources that could be given no "adequate description."[50]

The Indian people of the Cheyenne River Reservation, some of them at least, must have been plainly disgusted. Despite the fact that they had sent a delegation to Washington in the hope of keeping Congress from passing any bill that pertained to more than Schnasse County,[51] the Congress had acted unilaterally to open about one-half of their reservation to settlement. Dr. Hoxie is no doubt correct when he concludes with reference to the congressmen who passed the Gamble bill that

". . . the speed with which the 'Schnasse County opening' was expanded, and the fact that so few Indians were consulted reduce any suggestion that they acted for the tribe to the level of a cruel joke."[52]

Disgust and bitterness lingered. The excerpt from a letter from an agent at the Cheyenne River Agency to the Commissioner of Indian Affairs in 1909 set out in Dr. Hoxie's analysis is evidence of this. The letter is also informative on another point as the excerpt illustrates:

It appears that the people of this reservation cannot become reconciled to the idea that they did not have proper voice in the recent *ceding of the lands of this reservation to the United States.* I have taken special pains to explain how matters of this kind are accomplished, that the initiative is taken by Congress; that the action of Congress is final and the law must be obeyed. . . . (Emphasis added.)[53]

In the year after the passage of the 1908 Act and before the actual opening for settlement, it was the assumption of an agent working on the Cheyenne River Reservation that a cession of land to the United States was the effect of the then recent legislation.

On the basis of this study of the legislative history pertaining to S. 1385, this Court believes that the following propositions have been established. First, the Senate Committee on Indian Affairs in its own report referred to "reservations as diminished" and "reduced reservations"[54] having been well advised that Inspector McLaughlin had used these terms in his discussion of boundaries (which discussion was had with the aid of a map), and having been further

---

**48.** 42 Cong.Rec. 7018 (1908).

**49.** Hoxie, p. 57.

**50.** Reference is to an article from the Daily Capitol Journal, Pierre, South Dakota, June 4, 1908.

**51.** Hoxie, p. 55.

**52.** Hoxie, p. 56.

**53.** Hoxie, p. 58, quoting from letter of L. F. Michael to Commissioner of Indian Affairs, August 2, 1909, General Correspondence, Cheyenne River, file 054, Records Group 75, National Archives.

**54.** S.Rep.No.439, *supra*, at 4 and 5.

made aware that both Inspector McLaughlin and other officials in the Department of Interior were operating in the belief that a "cession" of land would be the effect of the Gamble bill. Second, the House Committee on Indian Affairs expressly adopted this portion of the Senate Committee Report just referred to.[55] Third, the debate in the House on the granting of sections 16 and 36 to the States was conducted with the belief that whatever the price paid for the lands, the grant was being made pursuant to section 10 of the enabling act by which North Dakota and South Dakota entered the union.

From these propositions it seems reasonable to conclude that Congress passed the modified Gamble proposal with the intent to accomplish what Inspector McLaughlin and other officials thought it would accomplish. We cannot pierce the minds of the legislators working back in 1908 to ascertain with certainty what their private thoughts were about this legislation. All we can do is examine the records for objective manifestations of congressional intent. In the judgment of this Court, the indicia of congressional intent that can be extracted from the records from the weeks immediately preceding the enactment of S. 1385 point unmistakably in one direction: Congress intended to diminish the size of the Cheyenne River Indian Reservation by altering its boundaries.

The inquiry is, of course, by no means complete, for the task of the Court is not simply to read legislative history, but to construe the Act in light of the legislative history. Additionally, the Court must be mindful of the canon of construction which requires that doubtful or ambiguous expressions are to be interpreted for the benefit of the Indians. This Court must examine the Act of 1908 and determine whether or not, in light of the legislative history and surrounding circumstances, the terms of the Act are unclear and whether or not the meaning of the Act with respect to the diminishment question is ambiguous.

## V. THE 1908 ACT

A. *Section 2 and its proviso.*

The Act[56] is entitled:

An Act to authorize the sale and disposition of a portion of the surplus and unallotted lands in the Cheyenne River and Standing Rock Indian reservations in the States of South Dakota and North Dakota, and making appropriation and provision to carry the same into effect.

Section 1, containing the operative language of the Act, reads as follows:

. . . That the Secretary of the Interior be, and is hereby, authorized and directed, as hereinafter provided, to sell and dispose of all that portion of the Cheyenne River and Standing Rock Indian reservations in the States of South Dakota and North Dakota . . . .

Section 2 contains the oft-quoted proviso which states:

That prior to the said proclamation the Secretary of the Interior, in his discretion, may permit Indians who have an allotment within the area described in section one of this Act to relinquish such allotment and to receive in lieu thereof an allotment anywhere *within the respective reservations thus diminished* to which reservation the said Indians may belong. § 2, 35 Stat. 460 (1908) (Emphasis ours.)

The term "reservations thus diminished" could mean two things.[57] It could mean that the amount of land belonging to the Indians after the opening would be less than before even though the reservation boundaries were the same; it could also mean that the reservation boundaries were changed and the reservation thereby reduced in size. The question is whether or not in the light of legislative history this

---

**55.** H.R.Rep.No.1539, *supra*, at 3.

**56.** The text of the 1908 Act was included as an appendix in *Stankey v. Waddell,* 256 N.W.2d at 127.

**57.** 478 F.2d at 687.

term is reasonably susceptible of more than one construction. We conclude that it is not for several reasons.

1. The records of Inspector McLaughlin's conferences with the Indians are filled with references to boundaries, and the changes in boundaries that would result from the compromise legislation which the Inspector urged the Indians to accept. Congress was aware of this.

2. The records indicate that Inspector McLaughlin and others conceived of the Gamble bill as a proposal that would result in a cession of land. As Justice Rehnquist acknowledged in *Rosebud,* the word "cession" in strict English usage implies a bilateral agreement. 97 S.Ct. 1368. Given the holding of *Lone Wolf v. Hitchcock,* 187 U.S. 565, 23 S.Ct. 216, 47 L.Ed. 299 (1903), Congress was not obliged to enter into a bilateral agreement with the Cheyenne River people in order to open land for settlement; Congress could act unilaterally. Thus, by using the word "cession," Inspector McLaughlin and others may have envisioned a bilateral agreement or they may have had in mind a unilateral action by Congress; that is really immaterial. The point is that "cession" is a word that refers to the transfer of territory from one sovereignty to another, and was thus construed in *Rosebud.*

In *Rosebud* the Supreme Court found that the word "cede" used in conjunction with "grant," "surrender" and "convey" was "precisely" suited to disestablishment.[58] Thus the technical misuse of the word was not allowed to cloud its essential meaning and did not ". . . make the meaning of the Act ambiguous as between diminution of the reservation boundaries on the one hand, and merely opening up designated lands for settlement by non-Indians, on the other."[59]

In the correspondence preceding this 1908 Act pertaining to the Cheyenne River Indi-

an Reservation, the word "cession" appears frequently. In his letter to the Secretary of the Interior on March 30, 1908, Inspector McLaughlin, making reference to his discussions with the Standing Rock Tribe, stated:[60]

> After the four speakers had expressed themselves in favor of relinquishing but twenty-nine townships of land, I stated my views very clearly as to the various phases of the question under consideration, whereupon Thomas Frosted, one of the four said spokesmen for the council, expressed his individual views, favoring the opening of the tract indicated in blue pencil on the inclosed map, and he was followed by Siaka, one of the leading Indians on the reservation, who also strongly spoke in favor of the *cession* thus indicated. (Emphasis added.)

With reference to his conversations with the Indians at the Cheyenne River Agency, the Inspector stated:[61]

> During the time our council was in session at the agency a council was also being held at the Cherry Creek Substation, 90 miles southwest of the agency, and H. N. Crouse, a farmer in charge of that station, phoned to me that afternoon (the 16th instant) that the Indians of the Cherry Creek district, then in council, had decided by a vote of 39–19—being 2 to 1—to relinquish a part of their reservation, and that 27 had voted to have the *cession* embrace the northern part of the reservation, and twenty voted to have the *cession* taken from the west and north in about equal quantities. (Emphasis added.)

Inspector McLaughlin thought he was discussing pending legislation that would involve a "cession." And the "cession" assuredly did not refer to possible future sales of 160 acre plots to farmers. The use of the word "cession" in conjunction with the con-

---

**58.** 97 S.Ct. 1368 (*citing DeCoteau*).

**59.** *id.*

**60.** S.Rep.No.439, part 2, *supra,* at 2; H.R.Rep. No.1539, *supra,* at 6.

**61.** S.Rep.No.439, part 2, *supra,* at 3; H.R.Rep. No.1539, *supra* at 7.

stant references to boundary lines leaves no room for reasonable doubt that the Inspector himself viewed the Gamble bill as legislation which would change the outlines of the reservation itself. The use of the word "diminish" and its derivatives appears repeatedly in this context. That being the case, "reservation thus diminished" on the face of the act cannot reasonably refer merely to amounts of land owned by Indian persons *unless the meaning of the phrase is completely divorced from its meaning in the Inspector's discussions which were incorporated into the legislative history.*

One cannot maintain the position that the phrase "reservation thus diminished" can *reasonably* be construed to mean sales of reservation lands to outsiders, *and* simultaneously take the legislative history in this case seriously. It is an "either-or" proposition. Either we accept the fact that Congress intended the same thing here as in the acts construed in *Rosebud* or we ignore the legislative history insofar as it incorporated correspondence that contains numerous references to a "cession" that would result from pending legislation.

3. The acreage calculations of the legislators who passed the Act make sense only if the Cheyenne River Reservation was diminished in a geographical sense. Before the 1908 Act the Standing Rock and Cheyenne River Reservations contained approximately five and one-fourth million acres.[62] The 1908 Act opened about one-half of the two reservations for settlement; approximately 1,728,000 acres were opened on the Cheyenne River Reservation and approximately 1,244,160 acres were opened on the Standing Rock Reservation.[63] The Senate report to which we have repeatedly referred (S.Rep.No.439), after stating the acreages to be opened, goes on to state as follows: [64]

> Should the bill become a law *it will leave to the Indians on the Standing Rock Reservation about 1,250,000 acres and to the Indians upon the Cheyenne River Reser-*

*vation about 1,150,000, which is exclusive of any allotments now taken or which may hereafter be taken prior to the opening of the lands to settlement in the area to be opened.* The lands reserved for the use of the Indians upon both reservations *as diminished,* in the opinion of your committee and of the Department, are ample and more than sufficient for the present and future needs of the Indians of the respective tribes. (Emphasis added.)

The acreages left to the Indians of the respective tribes as "diminished reservations" would not correspond to the figures here stated if the allotments in the area to be opened had been counted. In view of these figures, the only way one could logically conclude that "diminish" somehow refers to reducing the total amount of land held by Indians as opposed to reducing the size of the reservations is to assume that the Senators and Representatives were speculating that the acreages *within* the unopened area would someday be transferred to non-Indians in an amount equal to Indian allotments in the opened portion. The unlikelihood of this possibility is immediately obvious; moreover, the quotation from the Senate report refers to the acreages as "exclusive of any allotments now taken or which may hereafter be taken prior to the opening of the lands to settlement in the area to be opened."

The report is clear and convincing. In order to leave open the possibility that the term "reservations thus diminished" on the face of the Act refers to quantities of land lost by sale to outsiders, instead of diminution of reservation boundaries, one must disregard Senate Rep. No. 439, *supra.*

4. We have noted the fact that the Senate Committee on Indian Affairs submitted, as a supplemental report, the letter of Inspector James McLaughlin of March 30, 1908 to the Secretary of the Interior, which letter reported the results of his conferences with the Indians at Fort Yates and Cheyenne River. We have also emphasized

---

**62.** 42 Cong. 7004 (1908).

**63.** S.Rep.No.439, *supra,* at 4.

**64.** *id.*

that this letter and the two exhibits attached thereto became part 2 of Senate Rep. No. 439, 60th Cong. 1st Sess. (1908) and that the letter and the exhibits were also made a part of H.R.Rep.No.1539, 60th Cong. 1st Sess. (1908).

In explaining the effect of the compromise legislation which the Commissioner of Indian Affairs favored, Inspector McLaughlin stated:[65]

> The opening of the tracts as outlined in blue pencil on the inclosed map would *segregate* the Standing Rock and Cheyenne River reservations by opening a strip of 18 miles in width *between them,* and give to each of said agencies *legal subdivision outboundaries and compact diminished reservations* . . . and I am strongly of the opinion that the lines thus suggested would be for the ultimate best interests of the Indians. (Emphasis added.)

This Court cannot comprehend how the two reservations that had adjoined one another could be segregated and how there could be a strip of land between them without altering reservation boundaries. This Court likewise cannot comprehend how the effect of the bill, if passed, could be to create "compact diminished reservations" without altering reservation boundaries.

These reports contain material that is clear and convincing. We are back to the same old dilemma. Either "reservations thus diminished" in the 1908 Act referred to reservations with changed boundaries or the term in the Act had a meaning at variance with the meaning of the key word "diminished" in the committee reports. We either accept the proposition that Congress intended to alter the reservations' boundaries or we assert that the congressional intent cannot be deduced from these committee reports. There is no other reasonable option available.

### B.  *Section 7 and the Enabling Act.*

Section 7 of the 1908 Act states:

That sections sixteen and thirty-six of the land in each township within the tract described in section one of this Act shall not be subject to entry, but shall be reserved for the use of the common schools and paid for by the United States at one dollar and twenty-five cents per acre, *and the same are hereby granted to the States of South Dakota and North Dakota for such purpose as the same are located in the said States respectively*; and in case any of said sections, or parts thereof, are lost to said States by reason of allotments thereof to any Indian or Indians, or otherwise, the governors of said States, respectively, with the approval of the Secretary of the Interior, are hereby authorized, within the area in the respective States described in section one of this Act, to locate other lands not occupied not exceeding two sections in any one township, which shall be paid for by the United States as herein provided, in quantity equal to the loss, and such selections shall be made prior to the opening of such lands to settlement. (Emphasis added.)

The significance of a grant of two sections of every township (or sections in lieu thereof) was explained by Justice Rehnquist in *Rosebud.* When North Dakota and South Dakota were admitted to the Union, they came in under the provisions of an Enabling Act, 25 Stat. 676, which provided at § 10 in pertinent part:[66]

> That upon the admission of each of said States into the Union sections numbered sixteen and thirty-six in every township of said proposed States . . . are hereby granted to said States for the support of common schools . . .; provided, that the sixteenth and thirty-sixth sections embraced in permanent reservations for national purposes shall not, at any time, be subject to the grant . . . *nor shall any lands embraced in Indian, military or other reservations of any character, be subject to the grants* . . . *of this act until the reservation*

---

65.  S.Rep.No.439, part 2, *supra,* at 3.

66.  25 Stat. 676; v. 1, S.D.Comp.Laws (1978 revision) 187, 192.

*shall have been extinguished and such lands be restored to, and become a part of, the public domain.* (Emphasis added.)

As Justice Rehnquist stated: "The language of § 10 is mandatory . . . ."[67] Sections 16 and 36, those sections normally granted to states to help the states finance their public schools, could not be granted from lands within any Indian reservation in the states that came into the union under the Enabling Act of February 22, 1889, unless and until the reservations were (in part, at least) disestablished.

The alternatives then are these: (1) either Congress, with no indication of an intent to do so, used its plenary powers in section 7 to create a new scheme of land grants, or (2) Congress acted to implement the grant provision in the enabling act by disestablishing part of the Cheyenne River and Standing Rock Indian Reservations.[68]

As in *Rosebud*, the legislative history is enlightening. When the Gamble proposal was being debated in the House, a question about section 7 came up. This dialogue followed:[69]

MR. FINLEY: . . . In section 7 of the bill it provides that sections 16 and 36 are to be reserved for school purposes and to be paid for by the Government of the United States at the rate of $2.00 per acre. I wish to ask the gentleman this: When the State of South Dakota was made a State, was or not the State of South Dakota given school lands or lieu lands for school purposes to correspond with the amount of Indian lands held by Indians in reservations like this?

MR. SHERMAN: Oh, no. I am very sure that that was not done in either of the Dakotas, because it has not been done anywhere, as far as I know.

MR. FINLEY: The States have not been granted lieu lands where lands were held by the Indians?

MR. SHERMAN: There have been times later on when Indian reservations have been opened up that that has been done, but there are no lieu lands that could be used in the Dakotas at the present time.

MR. FINLEY: When the Territory was created into a State, a provision was made for the homesteaders?

MR. SHERMAN: A provision was made in the enabling act that the United States grant to the States sections 16 and 36 for school purposes.

MR. FINLEY: Right here, was any calculation taken of the lands held by Indians—

MR. SHERMAN: I will ask the gentleman from South Dakota [Mr. Hall] to answer the question.

MR. HALL: I will say that the enabling act under which South Dakota, North Dakota, Washington, and Montana were admitted—it was an omnibus bill—provided for the granting in presenti of sections 16 and 36 for school purposes, and then it provided that in the case of the Indian reservations that grant of these sections for school purposes should be held in abeyance until the reservation was opened. Does that answer the gentleman's question?

MR. FINLEY: Yes.

The legislators who considered the meaning and effect of section 7 thought that they were acting pursuant to the enabling act by which South Dakota entered the union. No shred of evidence indicates that a new and separate land grant was intended. The meritorious question at this juncture, therefore, is whether or not the conclusion of disestablishment *necessarily* follows in this case.

The plain language of the enabling act states that lands within Indian Reservations are not subject to the school sections grant "until the reservation shall have been extinguished" and until "such lands become a part of the public domain." The reasona-

---

67. 97 S.Ct. at 1369.

68. This appears to be in harmony with the analysis in *Rosebud*, 97 S.Ct. at 1370.

69. 42 Cong.Rec. 7005 (1908).

ble and natural conclusion would therefore be that when the grants of the school sections were actually made, from lands which were within the boundaries of Indian reservations at the time South Dakota became a State, *then the reservation status of the land from which the grants were made must have been extinguished, and the land must have been made part of the public domain.*

There are two possible ways of attacking this conclusion: (1) It can be argued that administrative treatment of the opened portion after the opening indicates that the land was not really public domain but rather continued to have a "reservation status;" and (2) It can be argued that only some of the opened area, not all of it, became public domain and the remainder never lost its reservation status. We will consider each of these arguments.

Dr. Hoxie researched the subject of the administration of the opened portion of the Cheyenne River Reservation after the opening.[70] He has established to this Court's satisfaction that large tracts of land in the opened area remained vacant for a long period of time; that stockmen were allowed to graze their stock on these "vacant ceded lands"[71] by obtaining permits for a fee; that the Superintendent of the Cheyenne River Reservation supervised the use of these lands; and that the Indians had a claim to the benefits derived from the lands. In sum, these lands were treated differently from lands otherwise designated as "public domain," and the Indians retained a beneficial interest in them. By coupling this information with the holding of the *Ash Sheep Co.* case,[72] it might be argued that the *effect* of the 1908 Act simply could not have been to put the "so-called ceded lands" into the public domain

even though the language of the enabling act appears to have required as much before the school sections were granted.

If we were writing on a totally clean slate this argument would be strong indeed. The fact of the matter is that the Supreme Court of the United States demolished precisely this argument in *Rosebud*.[73] As we understand the *Rosebud* opinion, the Supreme Court considered the question of the status of the opened portion to be "logically separate from a question of disestablishment."[74] And, the Supreme Court quoted from the opinion of the Court of Appeals for the Eighth Circuit in *Rosebud*, where it had been stated that "the fact that a beneficial interest is retained does not erode the scope and effect of the cession made . . . ."[75]

In short, *when the grants of school sections were made pursuant to the enabling act, the lands from which the grants were made were not thereafter in a reservation status.* The precise status of the ceded-yet-vacant lands is not in issue.

The question that arises next is whether or not the dissolution of the reservation status of land which precedes or accompanies the grants of school sections necessarily applies to the total tract of land involved here. In other words, we must inquire as to whether or not there is any reasonable possibility that only school sections themselves lost their reservation status or alternatively whether or not townships which ended up without any school lands due to allotments to Indians necessarily lost their reservation status.

The plain language of the enabling act implies that the grant of sections 16 and 36 is contingent upon the extinction of the reservation status of more than the school

---

70. Hoxie, pp. 87–93.

71. They were referred to as such by the First Assistant Secretary of the Interior in 1912 in a document entitled "Regulations Governing Use of Vacant Ceded Indian Lands." (Hoxie, App. 48)

72. *Ash Sheep Co. v. United States*, 252 U.S. 159, 40 S.Ct. 241, 64 L.Ed. 507 (1920) in which

it was held that the Indians retain a beneficial interest in the ceded lands until sale.

73. 97 S.Ct. at 1370, n. 24.

74. *id.*

75. *id. quoting* from the Eighth Circuit's *Rosebud* opinion, 521 F.2d at 102.

sections themselves. Section 10 of the enabling act states in relevant part: [76]

> . . . nor shall any lands embraced in Indian, military, or other reservations of any character, be subject to the grants . . . of this act until the reservation shall have been extinguished and such lands be restored to, and become a part of, the public domain.

It would require a very strained reading of the enabling act to arrive at the conclusion that the grant of sections 16 and 36 was contingent only upon extinction of the reservation status of the school sections themselves. It would require that "such lands" in the latter part of section 10 be read as referring to the numbered sections instead of "any land embraced in Indian, military or other reservations . . ." which appears to be the antecedent of the term "such lands." We are satisfied that Congress did not intend that the reservation status of school sections would be lost while the remaining land in a township retained a reservation status.

The question of whether or not Congress intended that some townships would lose their reservation status while others would remain in a reservation status has arisen because of the statement of the Court of Appeals for the Eighth Circuit in the *Erickson* case with reference to a proviso in section 9. The proviso referred to states: [77]

> That Indians residing upon their allotments in townships sixteen north of ranges twenty-five, twenty-six, twenty-seven, twenty-eight, twenty-nine, thirty, and thirty-one east shall have the right to use timber in said townships, . . . for domestic purposes only as long as the lands remain part of the public domain.

The Eighth Circuit thought that "Congress may have intended to restore only this Northern strip of townships to the public domain . . ." [78] The question now is whether or not this is a reasonable possibility in view of the breadth of inquiry that is possible under *Rosebud.*

In this Court's judgment it is not. The proviso was added to S. 1385 on April 15, 1908, as an amendment proposed by Senator Gamble.[79] The legislative history is devoid of any evidence that indicates that the status of this northern strip of townships was to be any different than the status of any other townships.

More importantly, certain ceded lands which had not been disposed of under the authority of 35 Stat. 460 and the presidential proclamation pursuant thereto were restored to tribal ownership and "added to and made a part of the existing reservation" by an Order of Restoration of June 12, 1941 and an Order of Restoration of January 21, 1952.[80] The wording of these orders makes no sense if the existing reservation at the time encompassed these lands as it would not have been necessary to make something a part of the reservation if it already was a part; moreover, an examination of the orders will readily indicate that no distinction whatsoever was made between the northern strip of townships and any other townships in the opened area. There is no basis at all in any documents presented to this Court for the proposition that certain townships in the opened area were made part of the public domain by the terms of the 1908 Act and that others were not. As we said earlier, the precise status of land in the opened portion is not in issue and need not be established. What can be unequivocally stated is that the *status of the land in the opened portion was uniform throughout upon the opening of the area to entry and settlement.* Of course, the status of the various pieces of land did not remain uniform; some sections went to the State and eventually much of the land was transferred in fee to homesteaders.

We further note that the proviso of section 9 and its "public domain" terminology tends to buttress this Court's conclusion

---

**76.** § 10, 25 Stat. 676.

**77.** § 9, 35 Stat. 460.

**78.** 478 F.2d at 687.

**79.** 42 Cong.Rec. 4755 (1908).

**80.** Defendant's Ex. A, Doc. 18 & 19.

that the school sections grant was contingent upon the reservation status of the entire tract being extinguished. In this respect there is no reason to distinguish between school sections and the other sections in a township. If Congress had intended to grant the school sections upon the extinction of the reservation status of only those sections, there would have been no reason for all of the remaining sections in the northern strip of townships to have been made public domain. But clearly, the townships (except for the allotments) were made public domain by the 1908 Act.

Earlier we stated that one could not accept certain committee reports as sources from which congressional intent can be derived and at the same time hold the belief that Congress had not clearly manifested an intent to alter the boundaries of the Cheyenne River Indian Reservation. After examining section 7 of the 1908 Act in detail in conjunction with the enabling act, we believe that one cannot accept the Supreme Court's Opinion in *Rosebud* as authoritative for this situation and still come out with the opinion that Congress could have intended anything other than disestablishment. Once it is accepted that Congress made the school sections grant pursuant to the enabling act, there is no logical way to construct a theory that leaves the area from which the school sections are granted in a reservation status, because the *presupposition of the grant pursuant to the enabling act is the extinction of reservation status.*

The counsel for the United States is commendably candid at this point and has stated:[81]

> The so-called "school lands" provision presents the United States with a particular dilemma. We think that as a legal matter the Supreme Court incorrectly decided that the inclusion of this provision means that the lands opened to settlement are no longer part of an Indian reservation.

81. M.U.S. at 22.

Government counsel then proceeds to try to distinguish section 7 and its effect in this case from the analogous provisions in the acts construed in *Rosebud*. The attempt is necessary for the government's position, but unsuccessful. There is no meaningful distinction that can be made between section 7 of this Act and the comparable sections construed in *Rosebud* and *Cook*.[82] Compare section 7 to: § 4, 33 Stat. 258 (1904) pertaining to Gregory County; § 6, 34 Stat. 1230 (1907) pertaining to Tripp and Lyman Counties; and § 8, 36 Stat. 448 (1910) pertaining to Mellette County; and § 8, 36 Stat. 440 (1910) pertaining to Bennett County.

It is this Court's conclusion that section 7 of the 1908 Act read in conjunction with section 9 and in conjunction with the enabling act is fully consistent with a conclusion of disestablishment and inconsistent with any other conclusion.

## VI. POST–1908 TREATMENT OF THE AREA IN DISPUTE

### A. *Legislative Treatment.*

On August 19, 1909, President William H. Taft proclaimed certain portions of the Cheyenne River and Standing Rock Indian Reservations open for entry and settlement on a date certain and under specified terms. 36 Stat. 2500 (1909). This proclamation was not, as was the proclamation of May 13, 1904, pertaining to Gregory County, "an unambiguous, contemporaneous, statement, by the Nation's Chief Executive, of a perceived disestablishment . . . ." 97 S.Ct. at 1371. It was, however, similar to the Presidential Proclamation of June 29, 1911 (37 Stat. 1691) pertaining to Mellette County. Comparisons of proclamations cannot be determinative one way or the other in this case.

Legislation passed subsequent to the passage of the Gamble bill and legislative proposals of the post-1908 era are more enlightening. As is well known to all who have studied the cases dealing with the

82. *United States ex rel. Cook v. Parkinson*, 396 F.Supp. 473 (D.C.S.D.1975), *affirmed* 525 F.2d 120 (8 Cir., 1975).

Rosebud and Pine Ridge reservations, the pressure for opening reservation land in South Dakota for settlement continued after 1908. An effort was made to open that portion of the Cheyenne River Indian Reservation that had not been opened by the legislation of 1908. Although no proposal to open the remainder of the Cheyenne River Reservation was ever enacted into law, one particular proposal reflects the contemporary understanding of the 1908 Act.

In 1909 Senator Gamble introduced S. 3285, the purpose of which was to authorize the sale and disposition of the remaining surplus and unallotted land on the Cheyenne River Reservation.[83] The bill went to the Senate Committee on Indian Affairs. On April 7, 1910, the Committee submitted its report[84] and attached to that report some official correspondence. One attachment, expressly made a part of the report itself, was a letter from Secretary of the Interior, R. A. Ballinger to Moses E. Clapp, Chairman of the Senate Committee on Indian Affairs, which letter stated in part:[85]

> The lands described in section 1 of the bill comprise *all* of the Cheyenne River Reservation. . . . (Emphasis added.)

In the report itself, the following statement was made:[86]

> The area proposed to be opened is 1,209,-600 acres.

The acreage which was stated to be the amount that would be opened by S.3285 and was said to include *all* of the reservation did not include the unallotted land in the area opened by the 1908 Act. The Senate Committee on Indian Affairs must have considered "the reservation" to be that geographical area which had not been included in section 1 of the 1908 Act.

The 1908 Act had been passed in the midst of a squabble over the price to be paid for school sections. The legislators who wanted to pay more than $1.25 per acre for the school sections for the benefit of the Indian people kept pressing the point, and in late 1908, S.7914 was introduced for the purpose of amending sections 7 and 8 of 35 Stat. 460, in order to give a higher price for school land. From the materials submitted to us, it appears that action on the bill was repeatedly delayed and it never came up for a vote.

Eventually Senator Gamble introduced another bill (S.3286) to carry out the same purpose. The bill came before the Senate on January 11, 1910, and at the time Senator Gamble referred to the enabling act by which South Dakota had come into the union as the basis for those particular provisions in the 1908 Act which granted school sections.[87] Senator Nelson from Minnesota requested that the bill be passed over until he had a chance to examine the enabling act.[88]

On January 18, 1910, S.3286 again came before the Senate, and a debate took place.[89] As usual, the problem was money. In the particular debate, however, Senator Gamble explained his understanding of the relationship between the enabling act, § 10, and section 7 of the 1908 Act in question. He stated:[90]

> Mr. President, I call attention to section 10 of the enabling act providing for the admission into the union of North Dakota, South Dakota . . .
> By the very act[91] itself, Mr. President, the lands become a part of the public domain, and the original grant to the States at that time becomes operative.

This appears to be an unequivocal statement by the sponsor of the 1908 legislation about the meaning thereof. The only ques-

**83.** 45 Cong.Rec. 39 (1909).

**84.** S.Rep.No.518, 61st Cong. 2nd Sess. (1910).

**85.** *id.* at 4.

**86.** *id.* at 2.

**87.** 45 Cong.Rec. 504 (1910).

**88.** *id.*

**89.** 45 Cong.Rec. 739 (1910).

**90.** *id.*

**91.** Referring to the 1908 Act.

tion was how much compensation the Indians should get.

The debate continued: [92]

MR. LODGE: Mr. President, I do not wish to delay the bill going over. I merely wish to say, as I asked for the reading of the section of the statute, that it does not in the slightest degree bind the United States to buy the lands and extinguish the title of the Indians on these reservations.

MR. GAMBLE: Mr. President, on a proper interpretation of the section it certainly does bind the government.

MR. LODGE: I am only interpreting the act as I heard it read.

MR. GAMBLE: It donates affirmatively sections 16 and 36, and pledges the faith of the government that when the Indian title becomes extinguished the grant will become operative. It has been the uniform practice of the government throughout its history in the public-land States to grant these lands, but in later years, as the land has appreciated in value, of course the price and amount we pay has been increased.

The government has urged that this particular debate between Senators Lodge and Gamble raises the possibility that the latter's view of the effect of the 1908 legislation which he sponsored may have in fact been erroneous because it was "strongly challenged" by Senator Lodge.[93] It appears to this Court that the disagreement was not over the *effect* of the legislation once it was passed (whether Indian title was extinguished, etc.), but instead centered on the question of whether or not the United States was *obligated* by virtue of the enabling act to buy certain lands when Indian title thereto had been extinguished. We see nothing in this debate that challenges our prior statement that grants of school sections presuppose the termination of reservation status.

While this type of maneuvering was going on in the Senate, the House considered and passed H.R.12438 which in substance did the same thing as S.3286; hence, when the House bill came to the Senate, the Senate version was dropped.[94] The relevant point in the passage of H.R.12438 through Congress is again a matter that took place on the Senate floor.[95] Senator Gamble offered an amendment which had been recommended by the Secretary of Interior. It read as follows:

> That the lands allotted, those retained or reserved, and the surplus lands sold, set aside for town-site purposes, or granted to the said States or otherwise disposed of under the provisions of this Act shall be subject for a period of twenty-five years to all the laws of the United States prohibiting the introduction of intoxicants *into Indian country.* (Emphasis added.)

The amendment was agreed to, the House bill was passed by the Senate [96] and then went back to the House with the liquor prohibition amendment. It was debated in the House.[97] Questions were put to Congressman Burke as to the reasons for the amendment. After explaining that South Dakota did not have a state constitutional prohibition against the sale of intoxicating liquor, he stated: [98]

> In the tract affected by this legislation the Indians have taken allotments, and one-third, perhaps, if not more, of the tract has been allotted to the Indians. The allotments run for twenty-five years, and it is the theory of the committees having jurisdiction of Indian legislation that during the trust period, at least, and while these Indians will be in that country holding allotments, *the laws relative to the introduction of liquor into the Indian country shall be extended into that country.* That is the purpose of this legislation. (Emphasis added.)

**92.** 45 Cong.Rec. 739 (1910).

**93.** M.U.S. at 23 n. 16.

**94.** 45 Cong.Rec. 1647 (1910).

**95.** *id.*

**96.** *id.*

**97.** 45 Cong.Rec. 1769 (1910).

**98.** *id.*

This legislation in 1910 would have made no sense if the geographical area authorized to be opened by the 1908 Act had been considered, as a legal matter, to be part of the Cheyenne River Reservation inasmuch as it would then have been "Indian country." Selling intoxicants in "Indian country" was already prohibited. 27 Stat. 260 (1892). Additionally, the reason raised in the debate for a possible objection to the amendment was that "the internal policy of the local government should not be determined by Congress on the liquor question but should be reserved for the State. . . ."[99]

These Congressmen had to have been acting on the assumption that the opened portion of "the reservation" was no longer legally in a reservation status. The same conclusion was reached by the Court of Appeals for the Eighth Circuit in examining an analogous provision in the *Rosebud* case[100] as well as by the Supreme Court in examining the same provision in *Rosebud*.[101] The Supreme Court of South Dakota has already reached the same conclusion as this Court in construing this 1910 liquor prohibition provision in relation to the 1908 Act itself.[102]

It seems clear that congressional action after passage of the 1908 Act harmonizes with the congressionally manifested intent surrounding the passage of the Act. Moreover, the post-1908 statements and actions heretofore referred to are inconsistent with an intent to preserve the 1889 Cheyenne River Reservation boundaries.

Government counsel admits that the liquor provision is problematic,[103] and does not dwell upon post-1908 legislative treatment of the area. The tribe, however, has devoted a portion of its memorandum to the subject.[104] Many quotations from the legislative histories of various bills are repro-

duced and together they only tend to establish the proposition that Congress, subsequent to 1908, referred occasionally to lands within the opened portion as being "within the Cheyenne River Indian Reservation."

On balance, legislation and the legislative histories of bills in the post-1908 decades provide firm support for the conclusion that this Court reached by studying the 1908 Act in the light of legislative history.

The tribe states in its brief that Congress and the Interior Department officials talked about "the reservation" in many instances as if it still reached to its 1889 boundaries. So did the State's Attorney for Dewey County who was called by defendant at the hearing on January 9, 1978.[105] Defense counsel asked:

What did your research show, then, in that regard, with regard to the cases involving Indians which were handled by the county in the opened portion?

The witness answered:

That since 1910 until the Condon case in 1972, the county exercised jurisdiction over both whites and Indians. This was limited strictly to the cases involving Indians *in the open portion of the reservation.* (Emphasis added.)

It appears that the term "the reservation," especially with the qualifier "opened portion," has been used by *many persons,* including those who are convinced that the opened portion is not *legally* reservation, to designate the geographical area that was affected by the 1908 Act.

*This is rather far removed, however, from congressional intent in 1908.* It *is* evidence that *could* be construed as a commonly shared perception of an undiminished reservation. But it is very slight in comparison with the probative value of the records heretofore discussed. We give no

---

**99.**  45 Cong.Rec. 1769 (1910) statement of Congressman Stafford of Wisconsin.

**100.**  521 F.2d at 112, 113.

**101.**  97 S.Ct. at 1376.

**102.**  256 N.W.2d at 126.

**103.**  M.U.S. at 24.

**104.**  Tribe's memorandum (hereinafter T.M.) pp. 7–11.

**105.**  *See* transcript of hearing held in Pierre, South Dakota on January 9, 1978, at 16, 17.

weight whatever to the correspondence cited by the tribe in conjunction with the passage of a 1975 Act as that was after *Erickson.*

B. *Judicial and Administrative Treatment.*

The first landmark in the jurisdictional history of the disputed area is *LaPlant, supra,* which was decided one year after the area was opened for settlement. Orville LaPlant was charged with the slaying of George Martin. He was alleged to have killed Martin on land that had been opened to settlement by the Act of May 29, 1908; specifically, on land designated as the townsite of Dupree. LaPlant claimed the federal court had no jurisdiction. The U. S. District Judge agreed.

At the hearing on January 9, 1978, the present state's attorney for Dewey County testified on the basis of his personal knowledge and on the basis of his research in the county records, and stated that it was his belief that the state had exercised jurisdiction over the geographical area opened to settlement (except for Indian allotments) for over sixty years or until *Erickson, supra,* in 1972.[106] South Dakota case law is in accordance with that view. E. g. *State v. Sauter,* 205 N.W. 25 (1925).

Counsel for the United States and counsel for the tribe have alleged that the jurisdictional history of the area is other than what the state's attorney indicated, and Dr. Hoxie has prepared a substantial amount of material that is purportedly of importance for the study of jurisdictional history. We have examined this material and will hereinafter state the conclusions we have reached.

The most direct challenge to defendant's and the counties' arguments is based upon that portion of Dr. Hoxie's analysis wherein he deals with law enforcement on the Cheyenne River Reservation after 1910.[107] Dr. Hoxie studied the function of the tribal courts, the state courts, and the federal court, as well as the work of the tribal police in the years following 1910, and then compared the roles played by these different governmental entities.

Dr. Hoxie has pointed out that the Cheyenne River Reservation had a reasonably well-developed tribal judiciary and tribal police force at the time of the opening; that this system was supervised by federal officials and generally met with their strong approval; that the Indians respected this tribal system and depended upon it; that the system remained intact after the opening in 1910; and that Indian persons living in the "opened portion" were not necessarily beyond the jurisdiction of tribal officials. He has further established that in the years following 1910 the U. S. Attorney for the District of South Dakota gave considerable attention to criminal matters arising on the Cheyenne River Reservation; that the U. S. Attorney successfully represented the Indian people when the officials of Dewey County tried to tax certain personal property belonging to the Indians; and that these criminal and civil matters were handled in federal court. Finally, Dr. Hoxie has pointed out that county officials took virtually no control over liquor traffic and gambling in the years following 1910; that county officials seldom attempted to prosecute Indian persons for crimes unless a white person was involved; and that civil matters involving exclusively Indian persons were taken to tribal court instead of a state court except for divorce cases. From this the Court is apparently asked to leap to the conclusion that the reservation was not diminished.

In spite of all of the labor that apparently was put into the analysis in this area, this part of the analysis has been of little value for several reasons. First, assertions are repeatedly made with respect to the criminal jurisdiction of the tribal and federal official, as opposed to the criminal jurisdiction of county officials, in the "opened portion" without making the crucial distinction between acts alleged to have occurred on Indian allotments as opposed to fee land

**106.** *id.*

**107.** Hoxie, pp. 100–128.

held by the settlers. Second, the *LaPlant* case is not recognized. Third, the conclusions that are drawn often relate more to the motives and attitudes of local settlers than to the legal question at issue. Finally, upon study and reflection, the conclusions in the analysis simply do not follow from the sources upon which they are allegedly based. Much of the information which was gathered for the analysis might arguably support some moral judgments, but it does not support the theory that the reservation remained undiminished after the 1908 Act.

We are *not* stating that *all* of the information is irrelevant. We are satisfied that towns which sprang up in the opened portion after the opening in 1910 had more than a fair share of scoundrels, and that the tribal government and federal government tried to protect the Indians under their jurisdiction from being brutalized by these people. It further appears that the county governments were short of funds and were inclined to ignore crimes involving only Indians, and that this vacuum was filled to some degree by federal and tribal authorities who may have at times assumed jurisdiction over matters, both civil and criminal, involving Indians without strict reference to the boundary between Indian country and land not in Indian country. This may have been proper for federal officials in some cases by virtue of their authority to supervise vacant ceded lands. In other cases general laws of the United States may have been the justification for federal intervention. In some cases there may have been no legal justification for assertions of tribal or federal authority. We cannot, however, on the basis of the evidence presented leap to the conclusion that federal, tribal or state officials in the years following the opening perceived the Cheyenne River Reservation as being undiminished.

A less direct challenge to the defendant's and the counties' assertions relative to the jurisdictional history of the area is made in reliance upon information about the government schools, the tribal council and the work of officials known as "district farmers" in the years following the opening.[108] The argument made in that part of the analysis is a particularized version of the argument discussed in Part II of this opinion. We will discuss briefly the information presented about the district farmers or "boss farmers."

At the time of the opening the boss farmer was a federal official of considerable importance on the Cheyenne River Reservation. As a key figure in the government's program to "civilize," he supervised the farming and cattle operations on a vast amount of land. Because he had access to both the Indian and non-Indian communities, he became an arbiter of disputes as well as administrator and technician. Dr. Hoxie has established with the supporting documents that the duties of the district farmers were not reduced by virtue of the opening for settlement. He has further demonstrated that the district farmers carried on with their duties outside of the diminished reservation after 1910. From this he concludes that the 1908 Act must not have diminished the Cheyenne River Indian Reservation.

Using Dr. Hoxie's own analysis, it appears that many Indian people took their allotments in the geographical area opened to non-Indian settlers in 1910.[109] In 1909 when the proclamation to open land for settlement was issued, 1,197 out of 2,179 allotments, or 55%, had been made outside of the diminished reservation.[110] The district farmers, it appears, continued to provide leadership and services for the Indians on their allotments off of the diminished reservation. The federal government was under no obligation to confine its services to persons residing within the geographical boundaries of the reservation. Thus, the

---

108. Hoxie, pp. 64–93. We omit here any reference to the administration of the opened area as that was discussed in Part V.

109. Hoxie, p. 38.

110. *id.* Also appendix 2 containing information from the allotment schedule in the Cheyenne River Agency realty office.

conclusion in the analysis is wrong because the initial assumption is wrong.

It was apparently assumed that federal officials assisting Indians in 1910 were necessarily working on reservations. Data was accumulated relative to the working areas of certain federal officials. As it turned out, they were found to have been working near the 55% who took allotments in the geographical area that was opened. It was then concluded that this must have been "on the reservation" as a legal matter. This Court does not criticize the accuracy of the data assembled or the chain of reasoning but does believe that the initial assumption was erroneous. The argument based upon the functions of government schools and the necessity for them, and the argument based upon the work of the tribal counsel suffer from the same deficiency.

## VII. CONCLUSION

Because it would also be applicable to this case, this Court again states the following from *Rosebud* :

> There can be little doubt but that the members of Congress coveted Indian lands. This Court must determine the intent of Congress as it existed at the turn of the century. Time and again the Indians were given reservations, only to have the settlers' need for land mandate a redefining of the reservation boundaries. While this Court does not necessarily agree with the mores or the methods employed at that time, there is little doubt that the congressmen were engaged in the process with the 'doing away' of the reservations. This Court's only function is to determine congressional intent, not to rewrite history.

This Court is aware of the many decisions that various courts have rendered regarding the jurisdictional boundaries of various Indian reservations. However, each congressional act and treaty is different and must be so examined. As the Eighth Circuit Court of Appeals said in *Kills Plenty, et al v. United States*, 133 F.2d 292, 295 (8th Cir. 1943):

> 'It can, of course, be argued that the words "within the limits of any Indian reservation" should mean the same thing in any statute, but the argument, we think, is unsound . . . .. To find that meaning the words must be viewed in their setting, and the history and purpose of the Act must be considered.'

When the Court of Appeals for the Eighth Circuit decided the *Erickson* case in 1973, the breadth of inquiry allowed by *DeCoteau* and *Rosebud* was not recognized as the applicable guide to statutory construction in a case of this type. Traditional and more limited methods of statutory construction were at that time relied upon. Operating within such a limited framework, the wealth of materials available here could not be considered. *Erickson* is therefore not viable.

The Supreme Court of the United States, having had the benefit of many materials on surrounding circumstances and legislative history in the *DeCoteau* case, stated:

> For the courts to reinstate the *entire* reservation . . . would carry us well beyond the rule by which legal ambiguities are resolved to the benefit of the Indians. We give this rule the broadest possible scope, but it remains at base a canon for construing the complex treaties, statutes, and contracts which define the status of Indian tribes.
>
> A canon of construction is not a license to disregard clear expressions of tribal and congressional intent. 420 U.S. at 447, 95 S.Ct. at 1094.

We have taken that admonition seriously. In this case, one can read the records and readily conclude that the congressional intent of the action of 1908 was contrary to the desires of many of the Cheyenne River Reservation people, but it is plain that Congress acted anyway with the intent to disestablish a portion of their reservation.

Based upon the foregoing, the defendant's motion to dismiss will be granted.